**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PARKER-HANNIFIN CORPORATION, and
PARKER INTANGIBLES, LLC

            Plaintiff,

v.

ZIPPERTUBING (JAPAN), LTD.,

            Defendant.

Civil Action No. 06-751-JJF

# ZIPPERTUBING'S OPENING CLAIM CONSTRUCTION BRIEF

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
(302) 652-5070

John B. Pegram
John D. Garretson
David Loretto
Michael Zoppo
Citigroup Center – 52nd Floor
153 East 53rd Street
New York, NY  10022-4611
(215) 765-5070

**ATTORNEYS FOR DEFENDANT
ZIPPERTUBING (JAPAN), LTD.**

Date:  July 1, 2008

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................. 1

II.    SUMMARY OF ARGUMENT ................................................ 1

III.   BACKGROUND OF THE RELEVANT TECHNOLOGY ............................ 1

       A.    The '348, '536 and '095 Patents ............................................ 2

             1.    The Claimed Technology ............................................. 2

             2.    Brief Summary of the File History ..................................... 4

IV.    LAW ON CLAIM CONSTRUCTION .............................................. 5

V.     ARGUMENT ........................................................................ 7

       A.    "core member…is not V-0 rated;" "effective to afford [the] gasket
             a flame class rating of V-0" .............................................. 7

             1.    "not V-0 rated" ...................................................... 8

             2.    "effective to afford said gasket…a rating of V-0" .................... 9

       B.    "exterior surface" ......................................................... 9

       C.    "thickness dimension" ..................................................... 9

       D.    "coating at least a portion of the interior surface" of the fabric member ........... 11

       E.    "penetrating…such that the exterior surface remains electrically conductive" .... 13

       F.    about 30-50% "by weight" of one or more flame retardant additives;
             about 30% "by weight" of one or more flame retardant additives;
             about 50% "by dry weight" of one or more flame retardant additives. ............... 13

             1.    "by weight" ......................................................... 14

             2.    "dry weight" ........................................................ 15

VI.    CONCLUSION ..................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Cybor Corp. v. FAS Technologies, Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) (en banc)..................................................................5

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)..................................................................15

*Default Proof Credit Card Sys. Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005)..................................................................15

*Halliburton Energy Svcs. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)..................................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)..................................................................9

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
  430 F.3d 1377 (Fed. Cir. 2005)..................................................................15

*Johnson Worldwide Assocs. Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999)..................................................................5

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc)..................................................................5, 6

*Multiform Dessicants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998)..................................................................5

*PC Connector Solutions LLC v. SmartDisk Corp.*,
  406 F.3d 1359 (Fed. Cir. 2005)..................................................................5

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..................................................................5, 6

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004)..................................................................1

*Southwall Techs. Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)..................................................................6

*Specialty Composites v. Cabot Corp.*,
  845 F.2d 981 (Fed. Cir. 1988)..................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................................................5


**STATUTES**

35 U.S.C. § 112......................................................................................................8, 10, 13, 14

## I.    INTRODUCTION

In this patent infringement case, Plaintiffs Parker-Hannifin Corporation and Parker

Intangibles, LLC ("Plaintiffs") accuse Defendant Zippertubing (Japan) Ltd. ("Zippertubing") of

infringing three related U.S. patents:  6,521,348 ("the '348 patent"); 6,716,536 ("the '536

patent); and 6,777,095 ("the '095 patent"). (Marsden Decl. Ex. A-C).[1, 2]   Over the past two

months, the parties have met and conferred to try to reduce the number of claim construction

disputes.  Zippertubing now submits this brief in support of its proposed constructions.

## II.    SUMMARY OF ARGUMENT

Some of the disputed claim terms are indefinite as a matter of law.  To the extent those

terms can be understood, however, Zippertubing's constructions are consistent with their plain

and ordinary meaning, the patents' common specification, and the prosecution history.

Plaintiffs' proposed constructions often ignore plain meaning and contradict other claim

terms.  Claims must be viewed in their entirety, however, not just as an assortment of isolated

terms.  *Power Mosfet Techs., L.L.C.  v. Siemens AG*, 378 F.3d 1396, 1408-09 (Fed. Cir. 2004).

Accordingly, Plaintiffs' constructions should be rejected.

## III.    BACKGROUND OF THE RELEVANT TECHNOLOGY

The technology in this case relates to electromagnetic interference ("EMI") shielding

gaskets.  These gaskets are used in computers and other devices containing electronic circuits.

When electronic circuits are active, they emit a radio-frequency EMI field that can

interfere with other devices.  In order to limit this interference, electronic devices have interior

---

[1]  Exhibits cited in this Memorandum are attached to the Declaration of William J. Marsden, Jr.,
    in Support of Zippertubing's Opening Claim Construction Brief, filed concurrently herewith.
[2]  Plaintiffs recently stated that they would drop a fourth patent from this case (U.S. Patent No.
    6,387,523), but they have not yet filed formal withdrawal papers.  *See* Marsden Decl. Ex. D,
    correspondence from Plaintiffs' counsel dated May 9, 2008.

shielding.  Access ports and other gaps, however, may allow the EMI field to escape.  Shielding gaskets fill these gaps.

EMI gaskets are typically constructed by wrapping a fabric around a foam core.  This fabric must be electrically conductive; otherwise, it cannot function as an EMI shield.  In addition, the entire gasket must be flame retardant if it is to be used in a commercial electronic device.

Flame retardancy is measured by Underwriters Laboratories (UL) standards.  This results in a UL rating, such as "V-0" or "V-1," with V-0 having the higher flame retardance.  *See, e.g.,* UL Standard No. 94, "Tests for Flammability of Plastic Materials for Parts in Devices and Appliances (1991)."  UL's testing standards have evolved over time.  For example, at the time the priority patent application was filed in this case (1998), UL did not have a "V" rating standard for foam cores.   Such cores were only eligible for "H" ratings.  "V" ratings, by contrast, were provided for entire gasket constructions.

A.    **The '348, '536 and '095 Patents**

1.    **The Claimed Technology**

The '348, '536 and '095 patents all have the same written specification.  The common specification acknowledges that flame-retardant EMI shielding gaskets were well known before Plaintiffs' first patent application. (Marsden Decl. Ex. A at 1:60-3:28).[3]  Thus, the patents only assert "further improvements in the design of flame retardant, fabric-over-foam EMI shielding gaskets." (*Id*. at 3:23-28).

---

[3]  Each patent in suit has slightly different pagination.  For convenience, patent citations in this brief will be to the '348 patent and will use the abbreviated form "[column #]:[line #(s)]"; *e.g.*, "1:60-3:28."

Plaintiffs outline these purported improvements in a "Broad Statement of the Invention." (*Id*. at 3:32:24). Briefly, a flame retardant coating is applied to the inside surface of the fabric in such a way that it does not penetrate, or "bleed," all the way through to the fabric's exterior surface. This allows the exterior surface of the fabric to remain electrically conductive, and gives the resulting gasket its EMI shielding ability. This construction is shown in Figures 4 and 5 of the asserted patents:



Fig. 4          Fig. 5

In these figures, "64" refers to the exterior fabric surface, "62" refers to the coated interior fabric surface, and "52" is the foam core.

Claim 1 of the '348 patent is representative of the asserted claims. Claim 1 is reproduced below with the disputed terms in bold italics:

A flame retardant, electromagnetic interference (EMI) shielding gasket comprising:

a resilient core member which is ***not V-0 rated*** under Underwriter's Laboratories (UL) Standard No. 94 extending lengthwise along a central longitudinal axis and having an outer surface extending circumferentially about said longitudinal axis,

said core member being formed of a foamed elastomeric material;

an electrically-conductive fabric member surrounding the outer surface of said core member;

said fabric member having an interior surface disposed facing the outer surface of said core member and an oppositely-facing, exterior surface, at least the *exterior surface* being electrically-conductive and the exterior surface defining with the interior surface a *thickness dimension* of the fabric member therebetween;

and a flame retardant layer *coating at least a portion of the interior surface* of said fabric member,

said flame retardant layer being effective to afford said gasket a flame class *rating of V-0* under Underwriter's Laboratories (UL) Standard No. 94 and *penetrating into said fabric member to a depth which is less than the thickness dimension of said fabric member such that the exterior surface of said fabric member remains electrically-conductive.*

There are additional "weight" limitations in certain other claims, which are also discussed below.

### 2.    Brief Summary of the File History

The applications that issued as the '348, '536 and '095 patents all originated from a common provisional application filed February 27, 1998.  Two other patents also originated from this application (U.S. Patents No. 6,248,393, "the '393 patent," and No. 6,387,523, "the '523 patent"), but Plaintiffs are no longer asserting them.  All of these patents share a common prosecution history.

Several important events occurred during prosecution that inform the proper claim construction.  For example, much of the disputed claim language was added in response to examiner rejections.  The specifics are discussed below for each individual term, but the amendments fall into several general categories:

(1)    the addition of "thickness dimension" and depth-of-penetration claim limitations;

(2)    the addition of "V-0" rating limitations; and

(3)    the addition of flame-retardant "weight" limitations.

All of these amendments were necessary for Plaintiffs to obtain their patents.

4

## IV.    LAW ON CLAIM CONSTRUCTION

Claim interpretation is a legal question for the courts.  *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc); *aff'd*, 517 U.S. 370 (1996).  Traditionally, the construction of disputed claim terms focuses primarily on the intrinsic evidence, which includes the claims themselves, the specification, and the prosecution history.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Several of the legal principles of claim construction were recently reviewed by the Federal Circuit in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005).  In *Phillips*, the court recognized the bedrock principle that the claims of a patent define the invention.  *Id.* at 1312.  There is a "heavy presumption" in favor of construing claim language as would be plainly understood by one of ordinary skill in the art.  *Johnson Worldwide Assocs. Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 986 (Fed. Cir. 1988).  Words in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning.  *See Multiform Dessicants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998).

The meaning of claim terms is assessed as of the time of the invention.  *Phillips,* 415 F.3d at 1313; *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1581.  Determining the customary meaning of a term to one of ordinary skill in the art includes the evaluation of the claim language "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

In addition to the specification, the prosecution history may contain additional intrinsic evidence useful in determining the proper construction of the claim terms. *Id.* at 1317 ("In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history, if it is in evidence.'" (quoting *Markman*, 52 F.3d at 980)).

Actions taken and statements made by the patentee, as reflected in the patent's prosecution history, are highly relevant to claim interpretation. *See Markman,* 52 F.3d at 980. Reference to the prosecution history is appropriate both to reinforce a claim interpretation and to identify any definitions of claim terms disavowed or disclaimed by the patentee. *Id.* In that regard, "arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995).

With regard to the use of dictionaries in construing technical claim terms, the court in *Phillips* noted that in many cases, determining the 'ordinary and customary' meaning of a claim requires examination of terms that have a particular meaning in a field of art. *Phillips,* 415 F.3d at 1314. Because the meaning of a claim term understood by persons of skill in the art is not often immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. *Id.* (*citing Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). Thus, the court made clear that the use of dictionaries to define technical terms is still appropriate.

In light of *Phillips* and recent case law developments, the Federal Circuit Bar Association Patent Litigation Committee has provided general guidelines for claim construction. In the event

that they might be useful, they are attached for the Court's convenience as Exhibit E to the

Declaration of William J. Marsden, Jr.


## V.    ARGUMENT

Claims 1, 8 and 15-17 of the '348 patent; claims 1 and 8 of the '536 patent; and claims 1

and 8 of the '095 patent are at issue.  Many of these claims have common terms, as illustrated in

the parties' Joint Claim Construction Chart ("Chart") submitted on June 2, 2008. (D.I. # 39).

In the following sections, the disputed claim terms in the Chart relating to one another

have been grouped together to make interpretation easier:


### A.    "core member…is not V-0 rated;"
    "effective to afford [the] gasket a flame class rating of V-O"

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claims 1, 16, 17 | "core member **[which] is not V-0 rated** under Underwriter's Laboratories (UL) Standard No. 94." | The core member would not be accorded a V-0 rating under UL Standard No. 94 were the core member to be submitted to UL for testing. | The core member has not received a V-0 rating under Underwriter's Laboratories UL Standard No. 94. |
| '348 claim 15; '536 claim 8; '095 claim 8 | "flame retardant layer **[being] is effective to afford said gasket a flame class rating of V-0** under Underwriters Laboratories (UL) Standard No. 94." | Plain and ordinary meaning applies, consistent with the specification.  A layer having flame retardant properties provides the overall gasket, in which the layer is found, with flame retardant properties that are sufficient so that the gasket has been accorded a V-0 rating by UL after testing for flammability under UL Standard No. 94. | The gasket would receive a V-0 rating if it were tested according to Underwriter's Laboratories (UL) Standard No. 94. |

 1.    **"not V-0 rated"**

The plain language of the claims recites that the core member ***is not V-0 rated***.   This simply means that the "core member" has not received a V-0 rating under UL Standard 94.

Plaintiffs' proposed construction adds a conditional 'if it were tested' limitation that does not appear in the claims.[4]   It also does not comport with the separate "effective to afford…a V-0 rating" limitation discussed below.  When Plaintiffs wanted a conditional limitation, they used the latter language.  "Is not," by contrast, is a simple declarative statement.  Nothing in the patent specification or prosecution history suggests otherwise.

It should be noted that the "V-0" limitations were added to the original '348 patent claims to overcome the Examiner's August 9, 2002 rejection for lack of enablement under 35 U.S.C. § 112.  The Examiner argued that the patent disclosure did not enable one of ordinary skill to make any and all EMI shielding constructions.  ('348 patent application; 8/9/02 Office Action (Marsden Decl. Ex. F) at  2).  In response, the applicants added the "V-0" language, as well as the "penetration," "thickness dimension" and "electrically conductive" limitations.  ('348 patent application, 11/13/02 Amendment and Response (Marsden Decl. Ex. G) at 2-3). The Examiner then allowed the application, and the '348 patent issued on February 18, 2003.

---

[4] Zippertubing reserves the right to seek judgment that this claim language is invalid under 35 U.S.C. § 112.  As mentioned above, V-ratings were not available for foam core members (as opposed to gaskets) at the time of the original patent application here.

2.    **"effective to afford said gasket…a rating of V-0"**

Once again, the plain meaning of this term is that the gasket would receive a V-0 rating if it were tested.  Otherwise, the "effective…" claim language would be  superfluous.  *See Innova/Pure*, 381 F.3d at 1119 (all claim terms are presumed to have meaning).

Plaintiffs' construction for this term is the simple, declarative construction they rejected above.  In short, Plaintiffs add non-existent words to the claims to construe "***not V-0 rated***," but ignore additional, <u>existing</u> words in the claims to construe "***effective to afford…a rating of V-0.***" If Plaintiffs desired the constructions they now assert, they should have drafted the claims accordingly.

**B.    "exterior surface"**

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claims 1, 8<br>'536 claim 1<br>'095 claim 8 | at least the **exterior surface** being electrically-conductive | Plain and ordinary meaning applies, consistent with the specification.  The exteriorly facing surface of the referenced article. | The outer face, outside or exterior boundary of the fabric member. |

The **exterior surface** is the outer face (*i.e.*, the exterior boundary) of the fabric.  The word "surface" is important because it defines where the "fabric" ends.  The word "surface" is also used in conjunction with the "interior" and "coating" limitations discussed below.

**C.    "thickness dimension"**

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claim 1, 8;<br>'536 claim 1;<br>'095 claim 1 | the exterior surface defining with the interior surface a | The distance between the exterior surface (as defined above) and the interior surface of the | The dimension represented by "$t_1$" in Fig. 2. |

9

| | "**thickness dimension** of the fabric member there between;" | fabric member | |
|---|---|---|---|

The term "thickness dimension" is precisely defined in the patent specification.  It is the dimension represented by "$t_1$" in Figure 2:



Fig. 2

With respect to Figure 2, the specification states that the "[f]abric member has at least an electrically-conductive first side, **16**, and a conductive or non-conductive second side, **18**, defining a thickness dimension, referenced at "$t_1$" in the cross-sectional view of Fig. 2. ('348 patent (Marsden Decl. Ex. A) at 5:42-45 (emphasis added); *see also id*. at 6:35-44 and claim 1). This definition takes into account the woven nature of the fabric, and the potentially varying "thicknesses" depending on where measurements are taken in relation to the threads.

Importantly, the term "thickness dimension" was added to the claims during prosecution to overcome the examiner's rejection under 35 U.S.C. § 112 for lack of enablement.  ('523 patent application; 10/3/01 Office Action (Marsden Decl. Ex. H) at 2; 1/4/02 Amendment and Response (Marsden Decl. Ex. I) at 1).  This amendment was intended to specify the degree to which the flame retardant permeates the fabric: "penetrating into said fabric member to a depth which is less than the thickness dimension of said fabric member…."

**D.     "coating at least a portion of the interior surface" of the fabric member**

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claims 1, 8; '536 claim 1; '095 claim 1 | and a flame retardant layer "**coating at least a portion of the interior surface** of said fabric member," | Plain and ordinary meaning applies, consistent with the specification. A layer having flame retardant properties covers at least a portion or the entirety of the interior surface of the fabric member. | The flame retardant layer is directly applied to the interior surface of the fabric member, covering at least a portion of that interior surface. |

This limitation refers to the application of the flame retardant layer. Here, the word "surface" is critical. It means that the flame retardant is applied directly to the fabric—not to some intervening material.

If the claims contemplated anything other than direct application, the word "surface" would be unnecessary. One could simply coat the interior of the fabric member. But, as noted above, applicants added this specific "surface" (and "thickness dimension") language to overcome the Examiner's claim rejections. They should not be allowed to withdraw it from the claims now.

This construction is also precisely what the patent figures and specification disclose. Figure 5, above, and Figure 6 show the direct coating of the flame retardant layer upon the interior surface of the fabric:



Fig. 6

(*See also* '348 patent (Marsden Decl. Ex. A) at 3:39-41 (wet coating on fabric); 8:59-9:2 (direct wet process); 9:34-41 and 61-65 (same); 10:8-11 (adhesion of coating on fabric <u>surface</u>)). Indeed, the specification does not disclose the application of flame retardant to any intermediate substance at all.  Such a substance would presumably fill the pores of the fabric, and thus prevent the claimed, allegedly-crucial partial penetration of the flame retardant.

E.     "penetrating…such that the exterior surface remains
       electrically conductive"

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claims 1, 8<br>'536 claim 1 | **"penetrating into said fabric member to a depth which is less than the thickness dimension of said fabric member such that the exterior surface of said fabric member remains electrically conductive**." | Plain and ordinary meaning applies, consistent with the specification. The coating enters into the fabric to a depth which is between the interior surface and the exterior surface such that the electrical conductivity of the exterior surface is not appreciably affected. | The flame retardant layer does not penetrate the fabric member to an extent that would cause the exterior surface of the fabric member to have a surface resistivity greater than about 0.1 Ω/sq. |

Zippertubing's proposed construction of "electrically conductive" is the definition expressly provided in the patent specification. "Electrically conductive" means having "a surface resistivity greater than about 0.1 Ω/sq." (*Id.* at 5:42-53; 11:3-7). Plaintiffs' proposed definition—penetration such that the electrical conductivity of the exterior surface is not "appreciably affected"—is fatally vague. Nowhere have Plaintiffs explained what "appreciably" means.

F.     about 30-50% "by weight" of one or more flame retardant additives;
       about 30% "by weight" of one or more flame retardant additives;
       about 50% "by dry weight" of one or more flame retardant additives.

| Claim No. | Claim Element | Parker's Proposed Construction | ZTJ and Seiren's Proposed Construction |
|---|---|---|---|
| '348 claim 8 | "said flame retardant layer comprising **between about 30-50% by weight** of one or more flame | The flame retardant layer when applied contains between about 30% and about 50% of flame retardant additives. | Indefinite under 35 U.S.C. § 112. |

| | | | |
|---|---|---|---|
| | retardant additives " | | |
| '536 claim 1 | "said flame retardant layer comprising **at least about 30% by weight** of one or more flame retardant additives | The flame retardant layer when applied contains about 30% of flame retardant additives. | Indefinite under 35 U.S.C. § 112. |
| '095 claim 1 | "said flame retardant layer comprising **at least about 50% by dry weight** of one or more flame retardant additives" | The flame retardant layer when dried or otherwise hardened contains at least about 50% of flame retardant additives. | Indefinite under 35 U.S.C. § 112. |

According to the patent specification, flame retardant additives are incorporated into a liquid emulsion, which is then directly wet-coated onto the interior surface of the fabric. (*see, e.g.*, '348 patent (Marsden Decl. Ex. A) at 3:39-49; 6:62-7:7; 8:61-9:43; Fig. 6). During the coating process, hydrodynamic pressure and viscosity are controlled to provide a thin layer that partially penetrates the fabric to provide protection, but does not make the fabric too stiff. (*Id.* at 8:61-9:43). This supposedly permits the resulting gasket to deflect and conform to the required spatial geometries. (*Id.* at 3:39-49). The specification does not disclose any special or unforeseen advantages conferred by the weight percentages listed in the claims.

A patent claim is invalid under the patent statute if it fails to meet the definiteness requirement. If a court determines that a claim limitation does not provide meaningfully precise claim scope, even if it can be reduced to words, then the claim is indefinite as a matter of law. *Halliburton Energy Svcs. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

### 1.    "by weight"

This term in the '348 and '536 patents is indefinite for at least two reasons. *First,* it does not specify wet or dry weight. During prosecution of the '095 patent, Plaintiffs acknowledged that the claimed additive percentages would vary markedly depending on whether wet weight or

dry weight (obtained by subtracting the water content of the liquid coating emulsion) was measured. ('095 patent prosecution history; 3/10/04 Preliminary Amendment (Marsden Decl. Ex. J) at 4). Thus, this claim term does not give objective notice to the public as to what is actually covered. *See, e.g., Default Proof Credit Card Sys. Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302-03 (Fed. Cir. 2005) (notice requirement is fundamental; public and competitors must be able to determine whether they infringe); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005). Plaintiffs tacitly admit this problem in claim 1 of the '095 patent, which specifies "dry weight" in an attempt to clarify the issue.

*Second,* Plaintiffs' proposed construction of "when applied," although vague, seems to suggest that the claims should be limited to a "wet weight" measurement at the time of application. But the claims of the '348 and '536 patents are directed to a finished <u>gasket</u>, not a method of applying a particular type of emulsion. *See IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005) (invalidating an apparatus claim incorporating a method limitation as indefinite). Furthermore, the patent specification does not disclose how one is supposed to take a dried, finished gasket and measure the specific "wet weight" percentage of flame retardant additives in it.

### 2.    "dry weight"

This limitation is indefinite for the second reason specified above. There is no guidance in the specification as to how to perform a "dry weight" measurement on the claimed, finished gasket, other than by referring to the characteristics of a liquid emulsion during its application in gasket manufacture. Plaintiffs' proposed construction referring to a "dried" or "otherwise hardened" flame retardant layer does nothing to resolve the ambiguity.

15

## VI.    CONCLUSION

For all of the reasons set forth above, Zippertubing respectfully submits that its proposed constructions should be adopted.

Dated:  July 1, 2008                        FISH & RICHARDSON P.C.


By:  */s/ William J. Marsden, Jr.*
     William J. Marsden, Jr. (#2247)
     919 N. Market Street, Suite 1100
     P.O. Box 1114
     Wilmington, DE 19899-1114
     (302) 652-5070
     marsden@fr.com


     *Attorneys for Defendant*
     ZIPPERTUBING (JAPAN), LTD.

Of Counsel:

     John B. Pegram
     John D. Garretson
     David Loretto
     Michael Zoppo
     FISH & RICHARDSON P.C.
     Citigroup Center – 52nd Floor
     153 East 53rd Street
     New York, NY 10022-4611
     (212) 765-5070
     mailto:marsden@fr.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2008, I electronically filed with the Clerk of Court

this **OPENING CLAIM CONSTRUCTION BRIEF OF DEFENDANT**

**ZIPPERTUBING (JAPAN), LTD.** using CM/ECF which will send electronic

notification of such filing(s) to the following Delaware counsel.  In addition, the

document was caused to be served on the attorneys of record, at the following addresses

and in the manner indicated::

### <u>VIA EMAIL</u>

Rudolf E. Hutz, Esquire
Francis DiGiovanni, Esquire
Steven A. Nash, Esquire (pro hac vice)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19801
rhutz@cblh.com
fdigiovanni@cblh.com
snash@cblh.com

*Attorneys for Plaintiffs*
PARKER-HANNIFIN CORPORATION
and PARKER INTANGIBLES, LLC

*/s/ William J. Marsden, Jr.*
William J. Marsden, Jr. (#2247)

17